Hear ye, hear ye, hear ye. The United States Code of Appeals for the Fifth Circuit is now open according to law. God save the United States and his Honorable Court. Good morning everybody and thank you for your availability for this unique Zoom oral argument. Today we have one case on our docket. So we now call case 19-30492, the Parish of Plaquemines v. Chevron. Mr. Keisler, I believe you have 15 minutes. Thank you, Your Honor, and may it please the Court. Peter Keisler on behalf of the appellants. I'd like to begin, if I may, by addressing the timeliness and merits of federal officer removal. And as to timeliness, two features of circuit law are critical in understanding why removal here was timely. First, this Court has held that an initial pleading must affirmatively reveal on its face the grounds for removal and another paper must be unequivocally clear and certain in setting forth those grounds for the removal clock to begin to run. And the defendant has no duty to look beyond those filings in order to discover a basis for removal. And second, this removed and indeed until just last February when the en banc court overruled that test in Latchley. And that test required a removing defendant to identify specific federal government directives that required the actions or omissions that the plaintiff claims were wrongful. This panel's August 10th opinion did not focus on that aspect of the federal officer removal test, and we respectfully suggest that it should lead the Court to reach a different conclusion than it did back then. Because neither the initial pleading in this case nor any other paper revealed the specific actions or omissions that plaintiffs challenged and that violated specific wartime federal directives. You're asking us to follow the Ninth Circuit's ruling in Durham, among other opinions. But that's sort of your main point here today, I take it? That's correct, Your Honor. But it's also this specific causal nexus test, which was actually more demanding than that which most other circuits impose for federal officer removal, because that's what required the defendant to identify specific government directives that would have been violated if the defendant had acted the way plaintiff is claiming it should have. So to be very concrete about this, Judge Ho, the report was the first time the plaintiff said that in order to avoid liability now, we were required during World War II to use steel storage tanks to employ directional drilling to slow the pace and the intensity of production. And those were the omissions, the claimed omissions that would have violated specific directives. Can we talk about Durham for a bit, because I want to first understand what standard you're asking us to apply, which is the Durham standard, as well as Chapman standard, before we talk about whether this case does or does not satisfy that standard. As I understand it, in Durham, the key information that needed to be provided and was eventually provided to provide notice was identifying the aircraft, the particular aircraft. Do I understand that correctly? In that case, that was the critical piece of information, yes, Your Honor. Right. So do I understand correctly, the plaintiff in Durham didn't specify any of the facts setting up the fact that Lockheed was, in fact, a government contractor. What Durham simply said was, these were the two aircraft, among others, perhaps, but these two aircraft. Well, that's correct, Your Honor. And what the court said, please, Your Honor. Go ahead. What the court said in Durham was that until that was specified, Lockheed Martin couldn't identify the specific government directive, that it was acting at a specific government direction in a way that caused plaintiff's injury and therefore couldn't satisfy their version of causal nexus test. That was what the case was here. In other words, there are a lot of planes that this guy worked on over, I think it was 20, 30 years, some of which would have been something where Lockheed could remove on federal officer grounds, others of which it could not have. And until they identified which planes, they had no idea whether this was potentially removable or not at all removable. That's right, Your Honor. That's how it played out in that case. So why is this case not analogous, because here you've got paragraph 29 saying that most, if not all, of the wells in question preceded 1978. And then like in Durham, a listing of specific well numbers, much like a listing of specific aircraft numbers. For a couple of reasons, Your Honor. First of all, in this case, what violated the wartime directives were not, as in Durham, the claim of how the person had been injured back then, which Lockheed Martin could know simply from knowing the plane was a subject of government direction. Here, the claim that was revealed for the first time in the expert report was that we were required to use steel storage tanks, to employ directional drilling, and to slow the pace and amount of production. That wasn't revealed in the complaint, and it was only those claims that would have violated wartime directives that said you couldn't use steel for that purpose, you couldn't employ directional drilling, and you couldn't, you had to increase the pace and amount of production. So to take the complaint specifically, take earthen pits or dredging or any of the specific things they complained about, if they had stuck to what they said in their complaint, in their complaint, they simply said the earthen pits were not best designed. They could have been designed better, better lining, they complained that they were unlined. When we got to the expert report, that was the first time they said, no, we're saying you shouldn't have used earthen pits at all. You should have replaced them with steel storage tanks. From the complaint, they hadn't focused on anything that we would say violated a wartime directive. If they had stuck with what was in their complaint, we would not be here today with a federal officer argument. But when you fast forward to the report, that is the first time they specified challenged omissions, that if we had done what they say we should have done, we would have been in violation of wartime directives. And under the... Where was this point made in the notice of removal? Oh, we very specifically said, yes, we very specifically said in the notice of removal that the expert report was the first time they identified actions that would have violated specific wartime directives. And we focused very specifically on the expert report and the specific things that they challenged, like using more steel for storage tanks, engaging in directional drilling, and slowing the pace and amount of production. But there's a second point, Judge Ho, if I could add to that, which is that Your Honor quoted paragraph 29, where they said, most, if not all. The standard is that the initial pleading has to affirmatively reveal on its face the grounds for removal. What did the pleading here say? In paragraph 25, they said they were challenging actions taken, quote, since 1978 and before. And then in paragraph 29, they said most, if not all, of those actions were unlawfully commenced. The complaint didn't affirmatively reveal on its face whether the subset of actions that they would be challenging were covered by most, and therefore didn't affirmatively reveal on their face which particular actions or periods of time were being challenged. And just to confirm that, Your Honor, subsequently in discovery, when the plaintiffs asked us for information about the broad time frame 1920 to 2013, and we objected on the ground that that was overbroad, they responded in a motion to compel, and this is quoted at page 21 of the Eastern District's decision in this case, they responded that they needed us to address that broad time period so that they could determine which activities were and which were not unlawfully commenced. So even as of discovery, they had not decided which specific activities and periods they were going to challenge, and if they hadn't decided it themselves, they couldn't affirmatively reveal it to us. So if I may, let me try to summarize what I think you're saying, and you tell me if I've got it right or wrong. You acknowledge that you were on notice as of the complaint and as of these discovery exchanges that you knew the time period was broad. It was going back to World War II for sure. You knew, so you knew that much. Your concern is you didn't know what particular legal theory regarding those World War II activities was at issue. Your Honor, no, I would state it differently. We knew that there was a broad time period that was potentially at issue, because they said since 1978 and before, and by definition, that covers all universe of possible time, but they said that only most of the activities in that broad time period were unlawful. So no, we didn't know that the World War II period was at issue, because we didn't know what was covered by most. And remember, all of this is against the backdrop of a standard that requires them to affirmatively reveal on the face of the pleading that the grounds for removal are present. So this is sort of like an Iqbal-type problem. They said at some point in time, you did something wrong, but they weren't specific about as to what. That's right, Your Honor. And they neither therefore addressed the specific time period, nor did they tell us what omissions they were challenging. And it was those challenged omissions, those things we learned about for the first time in the expert report, that gave rise to the conflict with federal wartime directives. And until that conflict was apparent, we could not have satisfied the causal nexus test, and therefore the grounds for removal were not revealed. And the one point I would add on timeliness, Your Honor, is that this court held in Morgan v. Huntington-Ingalls, footnote 10, that the liberal standard of interpretation that applies to the merits of federal officer removal also extends to the timeliness of federal officer removal. For the reasons I just said, we think we have a compelling case without the need of a presumption. But if the court thinks the issue is closer, we would suggest that that presumption itself strongly supports finding in our favor on this point. How does Latty-Lay help you in terms of your timeliness argument? It seems like it makes it even broader. I think at the outset of your argument, you stated it makes it broader. So wouldn't that trigger sooner your obligation to discern federal contract officer status and removal status? Your Honor, if it had been in effect at the time of the initial pleading and in the years thereafter, then there might be an argument that we would have had to apply that test. But the question is whether they revealed the grounds for removal at the time of their initial pleading or the other papers. At that time, the binding law of this circuit required that we satisfy the causal nexus test. It had not yet been overruled. So the question of what suffices for the grounds to removal we think has to be assessed at the time of the pleading. Otherwise, we'd be in the completely unfair situation in which we couldn't have removed then. But then when the law changes and we can remove now, we're suddenly told we're too late. So we would always be either too early or too late. If I could turn then to the merits of federal officer removal. Sorry, one more question. So I get your point that if the complainant just said, you know, it's something within these 80 That would be awfully broad and not specific. That would sound like the first round in Durham. But here you do have a specification of particular wells, much like in later in Durham and you have the specific identification of aircraft numbers. Why does that appendix F not then tell you, okay, we clearly know which wells are at issue. And we know, just like with the aircraft, we can definitely check whether we know Lockheed can check which aircraft they were You can check which wells were World War Two era. For two independent reasons, Judge Ho. The first of all is the list of serial numbers doesn't itself reveal on their face the date of these wells. In order to find that out, we would have to Well, I think the aircraft is something that is it's not just a number on this. This was 10 pages of just serial numbers to in order to find out what wells they were associated with. We have to It's literally numbers and letters SR 71 and C 141 Right, but that names a specific plane of which Lockheed would be aware. They don't have to go to a state database in order to determine which well that is. The other thing, Your Honor, is that these wells were in production for decades after World War Two. If you don't specify the activities that you're complaining about that, even if the well was initially permitted in during World War Two, that doesn't tell you when it was drilled, how long it was in production and specifically whether the activities that plaintiffs are specifically challenging which they did not specify were the ones in during World War Two or later, but Your Honor. So if I could turn briefly then to the merits of federal officer removal. The court said in Watson that the test for a private entity acting under a federal officer. Is whether it is supplying the government with an item the government needs pursuant to the government's subjection direction or guidance or control. And that's precisely the situation these companies were in during World War Two, when they were urgently conscripted to fuel the war effort and acted under the Petroleum Administration for war. To be specific, the government demanded a massive increase in And so it knew that merely leaving this to private sector competition and private sector management would not get its needs met. So it's set production quotas. It controlled access to materials. It issued directives as to production methods, and it even took the unprecedented step of exempting the companies from the antitrust laws precisely so that they could act collectively under government direction. And with the Attorney General's words were then were that this was a time of emergency, and he said the industry was acting quote under public authority to promote public interest and not to achieve private ends. Those were the elements that 60 plus years later, the Supreme Court in Watson would say constitute the test for federal officer removal. I see that my 15 minutes is up. If I might reserve the remainder for rebuttal, Your Honor. I do have one more question. What you're describing is certainly extensive regulation during the World War Two era, but it is. It sounds like it's still compliance with regulation as opposed to being a federal contractor, as in Durham. No, it's more than compliance with regulation. We are heavily regulated today, and we comply with regulations today. We don't contend that that makes us a federal officer. During World War Two, we had the additional element that Watson identified, which is that we were assisting the government in carrying out a governmental function and providing the government with an item that the government needs. And so setting production quotas is not normal regulation, Your Honor. Exempting us from the antitrust laws, setting up industry committees authorized by a work directly with the government agency to develop and execute the government's program such that, as the official government history said, they were acting as extensions of the government agency such that it was impossible to tell where one began and the other left off. That is nothing like traditional regulation. And you know that because after the war, all of that went away. Patrolling for administration for war disbanded. The industry committees disbanded. No more quotas. No more rationing. Because that was a unique, special relationship, in the words of Watson, that existed during wartime. And what's critical to understand about this case is that plaintiff's theory is the exact opposite of what the government was demanding of us then. Because plaintiff's theory is that we should have prioritized environmental protection and slowed the amount and pace of production by increasing the amount of critical wartime materials like steel and asphalt we were using. The government was demanding exactly the opposite, a massive increase with minimal use of materials. And it is not to denigrate the important values of environmental protection to say that at that point in history, the priority was elsewhere. It was on winning the war. And that conflict between what they are claiming we should have done and what the government is ordering us to do in order to supply the government with an item it needs, that's the heart of this case, and it strongly supports federal officer removal. And if the court has no questions, I'd reserve the rest of my time. Thank you. Indeed, you have. We'll now hear from Mr. Marcello. I'm pleased to court, Your Honor. I represent the parishes of Clackamas and Cameron. I'll first address the timeliness argument, Your Honor. Your Honor was correct in that paragraph 29 covers the basis. It basically says that most, if not all, of their activities conducted prior to 1980 were not legally commenced or established. But it also does something else. It also cites the specific laws that were violated, and it cites also the regulation that underlies the historical use exemption. You have to look at this. Excuse me, Your Honor. You have to look at this in the context of what the allegation is with regard to federal officer jurisdiction. The context is this. The allegation is that everything that they did during World War II was controlled by the government. The removal notice alleges that every phase of the industry was under strict control of the government, that the oil industry was actually fused into one giant organization with the government, that the government had almost complete power over the industry. So if they're being told on the face of the petition that most, if not everything, they did did not satisfy the historical use exemption, most of it, everything they did was not legally commenced or established, and their position is, is that most, if not everything, they did was controlled by the government. They knew enough on the face of the petition to remove. And the issue here, Your Honor, is basically that what is the relationship between the asserted federal authority and the charged conduct? We're not talking, the charged conduct is what they actually did during the war. And there are many specifics with regard to the activities in the petition. The charged conduct was using pits that leaked. The charged conduct was using defective waste disposal facilities, defective production facilities. And all of this is laid out in paragraphs, paragraphs 17 through 21, and paragraph 25 of the petition. All of these particular activities were laid out for them, and they were told in the petition in paragraph 29, that this charged conduct, the charged conduct was illegal. The law, I think, Your Honor, was misstated by Mr. Kaiser. The lead case, the controlling jurisprudence in this circuit is the Boesky case. And the case clearly says that the initial petition does not have to unequivocally allege the grounds for jurisdiction, federal officer jurisdiction. Here, Your Honor, what they're doing is, is they're asking the court to look at the well serial numbers and totally disregard the fact that paragraph 29 says, says that everything they did was not in compliance with the historical use exemption. The fact that the well serial numbers are not dated is no excuse for not reading the entire petition. The grounds have to be... I heard them say that the well numbers, uh, they could not have determined on their own, uh, when the historical information about the well number. They had to go to you guys to get that. Is that... It's public record and it's, it's their, it's their wells. They know more about them than anyone does, even, even the Department of Natural Resources that has a database that has all the well serial numbers. Plus, anyone who's in the industry knows very clearly that you just look at the number of digits in the well serial numbers, you can tell how old they are. Uh, the fact, Your Honor, is that this is knowledge that is objective knowledge that, that anyone in those companies would have known, hey, we're being sued for stuff, activities a long time ago, especially when you're talking about four and five digit, well serial numbers. But be that as it may... But counsel, if you say that most or all of the activity is illegal, you haven't specified in any way exactly what it is about which specific well. You can live up, give a long list of wells and you don't say, this is what I am complaining about with respect to this specific well until you get to the expert report, right? No, Your Honor. I think the expert report, respectfully, Your Honor, the expert report basically talks about what they should have done, what were the alternatives. We told them very clearly in the petition that everything they did was not legal and we listed the actual laws they violated and the actual activities they engaged in. Well, you said most, if not all. Right. Right. But I mean, obviously they don't know what most means. Well, maybe they don't, but what they do know is that it only takes one violation that's covered by federal officer jurisdiction to cause removal. That's it. I don't think this is basically what the lower courts in this circuit have called... That would be an application of what the lower courts call a head in the sand rule. They just can't put their head in the sand. They have to use a reasonable amount of intelligence and looking at the petition to decide what they have. And insofar as it's not having knowledge of the new Latchley test, it's very, very clear, Your Honor, that that really doesn't matter because in the Latchley case itself, and I think it was the Latchley case was Judge Engelhardt's case. In the Latchley case, they removed in 2017, and the Zaran case, which has a more liberal standard, that was removed in 2015. So they had enough information. This is a federal defense. We don't have to plead a federal defense in our petition. Can I ask you a question about the merits of federal officer removal, assuming we get past the time on this question? We obviously have cases that go all kinds of different directions. Our court obviously had to go on bonk earlier this year in order to resolve it or try to resolve at least some parts of it. Do you think it is a fair summary of the federal officer removal standard that we ask whether the federal government or an officer thereof is the but-for cause of the plaintiff's injuries? Your Honor, I don't think that Latchley adopts the but-for cause. Certainly doesn't. So I'm trying to figure out how to harmonize these various cases, and it strikes me that one of the things that's really going on when we're trying to figure out if a federal officer is involved in the plaintiff's injuries sufficient to trigger the federal officer removal is would these injuries have happened if the federal government hadn't been involved, if they hadn't commissioned the submarine to have asbestos in it, if they hadn't commissioned the planes to have asbestos in it, if they hadn't commissioned the oil wells to be built the way they were and not to have the lining that they were supposed to have. And so irrespective of the case, I'm just trying to figure out a rule that tries to capture where federal officer removal is appropriate and where it's not. And this is one of the patterns that seems to jump out to me. Well, I think, Your Honor, the case law basically says that this causation aspect, the causal nexus aspect you're talking about is sort of collapses with regard to the amount of control. And that's really the issue to look at. Here, what we have is intense regulation, and I would argue not even intense regulation. Actually, the papers and the history calls it minimum regulations. And they're trying to use these minimum regulations to say that, well, they had to do what the government told them to do. And therefore, the injury resulted from that government direction. But in specific answer to your question, Your Honor, I think it depends entirely on the amount of control. And those issues of causation do get wrapped up with regard to the amount of control, probably not as much today post-lateral aid as it did pre-lateral aid. But in this particular case, I just want to point out the main treatise that's relied on, the main source that the companies are asking, Your Honors, to treat as direct government control or government control sufficient to satisfy the Watson standards, which are direction, guidance, control. You have to have a special relationship that involves payments and so forth. All of those factors, Your Honor, are not present here, because even the documents that they rely on specifically say that this was an issue of minimum regulation. The Frey and Eden treatise says basic PAW policy was that regulation and control be kept to a minimum. One of the more important PAW policies was the expressed intention of the government to promulgate only minimum regulations. And I would suggest, Your Honor, that there really is an issue. Honestly, there is an issue in this case as to who is controlling who. In our briefing, we quote a talk by Mr. Knowlton, who was head of production, and he tried to summarize what was going on with regard to the oil company relationship, oil company's relationship with the government during the war. And keep in mind, all we're talking about here, we're not talking about the government saying you've got to do something a certain way. This business about quotas and so forth, and we detail all that. We don't have enough time to get into it now, but there were no quotas. This was trying to really maximize the productivity, just like of the various reservoirs that were discovered at the time the war started. And what Knowlton says is that no industry using comparable quantities of materials enjoys the same leeway in the acquisition and use of its materials. The petroleum producer is the only industrial operator in any industry, mind you, who obtains his material by a process tailored to his needs. So they're trying to turn the history here on its head. What was happening is this, the whole regulatory scheme that this removal is based on, was an attempt to try to maximize the efficiency of the oil industry to meet the wartime needs. It was actually designed to help the oil companies, not to control them. Can you give another example? I'm trying to think of one and I can't. An example where the federal government has waived the antitrust laws and then created a special agency to regulate the production of a product. Because the question is whether there's a special relationship, and that sure seems special in the sense that I can't think of another example. Well, the issue of special relationship, your honor, the way I read the ruling in Watson is that there has to be some formal delegation of authority. Actually, Watson says there has to be a formal delegation of authority or a contract. We have no contract here, we have no formal delegation of authority. As a matter of fact, the Watson case says specifically that when the government delegates, it does so explicitly, it does not do it implicitly. Insofar as the waiver of the antitrust, in answer to your question, your honor, insofar as the waiver goes, there was a waiver of the antitrust laws and that allowed the industry to be more efficient and cooperate with each other. And that was it. But cooperation, all it is, is all it was, it encouraged cooperation and there was cooperation. But cooperation is not control. It doesn't even come close to the control needed for federal officer jurisdiction. So the basic work of federal officer jurisdictions under there is no guidance. There's no direct guidance. There's no contract. There's no special relationship. And there's no demonstrable effort to assist the government in carrying out a task that it would normally perform. The government was never in the oil business. Now, there are instances where during the war, the government actually took over the production of rubber. The government actually took over the production or controlled the production of 100 octane fuel add gas, which has been set forth. But these are activities far removed from what we're talking about in this case, which are only exploration and production activities. The defendants have not cited, it's been a long time since World War II ended. The defendants have not cited one case where federal officer jurisdiction has been premised on rationing regulations and materials regulations that occurred during World War II. There's simply no basis for this removal. Timeliness aside, there's just no basis for it. I yield the rest of my time to Mr. Price. Hello, Donald Price on behalf of the Department of Natural Resources. I was prepared primarily to discuss the federal question issues, which obviously have not come up in this argument. But with respect to the timeliness of the federal question, I think you would be hard pressed to find a removal that was more untimely than the federal question removal in this case. Because if you look back into the record, in June of 2016, 23 months prior to this, Apache, in the Cameron versus Oster case, specifically raised gun grable, federal question jurisdiction based upon federal regulation of canals and dredging in wetlands, which is the exact same basis that is asserted here. So two years before this removal was untimely. Furthermore, if you look at the well-pleaded complaint that was filed by the parishes in this case on behalf of the state of Louisiana, and let's remember what this case is. This is a case where the state of Louisiana itself, through its Department of Natural Resources, through its Attorney General, and through its proxies, the parishes of Cameron and Plaquemine, are attempting to enforce state law in state courts on a matter that Congress has explicitly entrusted to state regulation under the Coastal Zone Management Act. The petition that was filed by the parishes specifically disclaimed any reliance upon any federal law, and in fact, affirmatively alleged that all federal statutes, regulations, and permits weren't complied with by the defendants. Therefore, there is essentially no construction of this petition that is imaginable that would place the fundamental question here, which is, did these oil companies properly obtain and comply with coastal use or what the federal government required these companies to do back in the 40s? So, there's no necessarily raised federal question. There's no substantial dispute. As I stated, the plaintiffs, the parishes stated in their petition that the defendants actually complied with federal law. So, unless the defendants contend that they did not comply with federal law, then there's certainly no substantial dispute as to whether federal law was complied with. So, the theory must be, I'm sorry, counsel, can we just pause on that for one second? The theory must be that federal law provides a standard of care in creating these wells and everything else. That is, it's a certain level and that state law is free to impose a higher standard of care with respect to what constitutes good faith and the lawful commencement of the 1940s. I suppose that's their theory. The fact of the matter is that federal law didn't really apply any standards that make a difference in this case. We think that all of the federal laws were complied with. It's simply a matter of whether they complied with the state law, because this is an area that is mineral production is primarily an area of state concern. And certainly, Congress in the CZMA sanctioned the use of the states taking authority over their coastal zones, which is what this case involves. Well, there's a sentence in your reply brief that says that compliance with the federal laws in the 1940s is not a license to violate state law. And so, what I'm trying to understand is the state law that you're talking about, are these common law concepts of how to construct these with prudence and good faith? Is that the answer? Yes. We have a constitutional, help me, what's the word I'm looking for? We have Article 9 of the Section 1 of the Louisiana Constitution, encompasses a public trust doctrine, which requires the state to take actions to protect the public trust. That's an element of it. And we've referred to in the lower courts and the judges referred to in their good faith, reasonable standards that we were relying on with respect to arguing that they're not entitled to the exemption for seeking permits after 1980. So, that's what it all comes down to is whether they were required to obtain and comply with permits after 1980. And the violation of that is simply not relevant. Thank you. I have one more question. Yes. The last minute you talked about violations of various Louisiana state, I think, sort of common law prudence type requirements. Where are those mentioned in the complaint? It's just illegally. I don't think that it refers to the exemption specifically, which is in the coastal, the slur. It quotes the historical exemption statute that doesn't refer specifically to the laws that was violated other than simply saying the federal law was not violated. Mr. Kaiser, you have five minutes. Thank you, Your Honor. First of all, to begin where we just ended up, not only did not the complaint cite any state common law tort law, the state specifically disclaimed reliance on any tort law. That is in paragraph 33T of the Plaquemines complaint and 33Q of the Cameron complaint. With respect to the timeliness points that Mr. Marcello made, first of all, he said twice that paragraph 29 said everything we did was unlawful. It didn't, of course. It said what Judge Oldham said, that most, an unspecified most of the activities were unlawful. And as to the suggestion that Mr. Marcello made that our position is just that everything that was done during World War II was done under a specific federal directive, of course that's not the case. There were directives as to some things and choice by industry as to others. And so that's why I say if their complaint had stuck with what they said in their petition, which is that the earthen pits should have been a federal officer argument, because they wouldn't be asking for anything that would violate federal directives. But once they say you should use steel tanks, that violates the prohibitions on using steel for that purposes. And once they say you should use directional drilling, that violates the directive that said we had to drill vertically. In addition, Judge Oldham, you asked whether it was a but-for cause, a but-for test for causal nexus. First of all, I don't think it is quite a but-for test, because I think the real test is, is the action or omission being challenged? Was it required by a federal directive? Which doesn't actually ask whether you would have done it differently if the directive didn't exist. But if that were the test, we would have satisfied it. The Potash Field in Plaquemines doubled its production from 1941 to 1942 in response to the war and kept it at that high level throughout the war effort. And the suggestion that there were not production quotas, you don't stand up a whole new government agency to manage the necessary increase in oil production when you plan simply to ask people to increase the production. There were quotas. We've cited the documents in the record where the quotas were set. Both the Potash Field in Plaquemines and the Hackberry Fields in Cameron were controlled fields subject to wartime directives that required that one of the reasons for land loss is what they called the, quote, the 24-7 nature of operations, citing what was going on in the Delacroix Field beginning in 1941. They are directly challenging the intensity and the pace and the amount of production that were mandated by the federal government. And that's why you had an executive order setting up these industry committees, why you had an antitrust exemption, and the notion that this was all voluntary. The Second War Powers Act made it a criminal violation not to comply with these orders. And each of the orders we've cited had a provision saying it was a criminal act to engage in a willful violation of these orders. And finally, I think Mr. Marcello said that Watson requires that there be a delegation. That's not the test of Watson. Watson mentioned a delegation because it was responding to the argument that Philip Morris said that there was a delegation in its situation. And the court said no, there was no delegation there. But the test that Watson established was that there had to be, you had to be providing the government with an item it needs or otherwise helping the government to carry out a governmental function and doing so pursuant to its objection, guidance, or control. That use of the word guidance shows that the question of whether this was voluntary or compelled doesn't really matter because the government influence can be anywhere along that spectrum of subjection, guidance, or control. But here, of course, we had all three. We had the subjection because we were subject to the criminal law. We had the guidance because we were in many cases responding to government recommendations. And we had the control because they controlled the access to materials. And if control access to the means of production, you control the ability to put people out of business. So if the court has no further questions, I thank the court. Well, thank you all for this unique Zoom-based argument. Thank you for the briefing and the quality arguments. The case is submitted. Thank you. Thank you, Joe.